UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

|  |  |
|---|---|
| JOSE JUAN ESPINOZA,<br><br>Plaintiff,<br><br>v.<br><br>D. ASUNCION, et al.,<br><br>Defendants. | Case No. 16-cv-01263-LB<br><br>**ORDER GRANTING SUMMARY JUDGMENT FOR LACK OF EXHAUSTION** |

## INTRODUCTION

In this prisoner's civil-rights case, Jose Espinoza claims that Salinas Valley State Prison officials violated his Eighth Amendment rights when a guard shot him to end a prison-yard fight.[1] At the parties' request, the court staged the case to address first whether Mr. Espinoza exhausted his administrative remedies under the Prison Litigation Reform Act ("PLRA") (and deferred addressing the merits of the claims pending that inquiry).[2] The case is in the first stage — PLRA exhaustion.

The defendants moved for summary judgment on the ground that Mr. Espinoza failed to

---

[1] First Amended Complaint ("FAC") – ECF No. 40. Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents. The parties consented to magistrate-judge jurisdiction. (Consent Forms – ECF Nos. 3, 14, 23–24.)

[2] Case-Management Order – ECF No. 32.

exhaust his administrative remedies by not filing a grievance within 30 days after he returned from an outside hospital to the prison infirmary.[3] Mr. Espinoza spent three weeks in the outside hospital, thereafter recuperated for about three months in the prison infirmary under administrative segregation, then returned to administrative-segregation general housing, and filed his grievance two weeks later, on July 6, 2014.[4] (The prison excluded from the 30-day period the three weeks that Mr. Espinoza spent at the outside hospital but did not exclude the three months in the infirmary; it thus denied the grievance as untimely.[5])

The court denied the defendants' summary-judgment motion because the evidence, viewed in the light most favorable to Mr. Espinoza, raised a genuine dispute about whether the prison's administrative procedures were available to Mr. Espinoza while he was in the prison's infirmary.[6] Because an inmate need exhaust only *available* remedies, *see Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014), the court held that the defendants did not carry their burden of showing that Mr. Espinoza failed to exhaust.[7]

The defendants then requested an evidentiary hearing on the question of exhaustion.[8] The court granted the request because exhaustion is a threshold issue that "should be decided, if feasible, before reaching the merits of a prisoner's claim." *Id.* at 1170. The court noted that the overarching issue was whether Mr. Espinoza took reasonable and appropriate steps to exhaust his remedies in the infirmary by asking two officers for grievance forms, and whether the officers' failure to provide those forms rendered the grievance procedure effectively unavailable.[9]

The court identified the following issues of disputed fact from the parties' summary-judgment evidence:

---

[3] Summary-Judgment Motion – ECF No. 45.

[4] Medina Decl. – ECF No. 48, Exs. B & C.

[5] *Id.* ¶ 7.

[6] Summary-Judgment Order – ECF No. 78.

[7] *Id.* at 20.

[8] Case-Management Statement – ECF No. 79 at 3–5.

[9] Order Granting Request – ECF No. 81 at 2.

1        (1) Did Mr. Espinoza ask the two correctional officers for a form and did they tell

2        him that someone would have to come help him?

3        (2) When did Mr. Espinoza ask for the form?

4        (3) How many officers did he encounter on a daily basis?

5        (4) Did he have immediate access to forms when he left the infirmary and entered

6        an administrative-segregation housing unit?[10]

7 The court also noted that the summary-judgment evidence did not create a dispute about the

8 general availability of the grievance process at the prison.[11]

9     Based on that framework, the parties submitted additional exhaustion-related evidence at an

10 evidentiary hearing on July 13, 2017. The court now concludes that Mr. Espinoza did not take

11 "reasonable and appropriate steps" to exhaust his administrative remedies by requesting a

12 grievance form four times. The court grants the defendants summary judgment.

13

14 **FINDINGS OF FACT**

15     The main dispute is whether the Salinas Valley State Prison administrative-grievance

16 procedures were available to Mr. Espinoza in the infirmary — *i.e.* whether he had the ability and

17 opportunity to exhaust his administrative remedies. The court thus sets forth the facts regarding

18 the grievance procedures at the prison and Mr. Espinoza's access to them. To the extent that facts

19 are undisputed and contextual, the court cites facts that it found previously at summary judgment,

20 and it finds additional facts to resolve the exhaustion issue.[12] For ease of reference, the fact

21 sections in this order have the same titles as those in the earlier summary-judgment order.

22     At the hearing, the parties submitted, and the court admitted, documentary and testimonial

23 evidence about (1) the grievance process at the prison generally, (2) access to grievance forms in

24 Mr. Espinoza's two housing placements (in administrative segregation in the infirmary for his

25

26 ────────────

27 [10] *Id.* at 2–3.

[11] *Id.*

28 [12] *See* Summary-Judgment Order – ECF No. 78 at 3–4.

three-month recovery and thereafter in general administrative-segregation housing), and (3) Mr. Espinoza's efforts to exhaust his administrative remedies. The court admitted Exhibits 1–2, 11 (under seal because it implicates prison security), 101–07, 111, 113, 120–21, 124, 127–30, 132, and 139.[13] The parties jointly identified witnesses.[14] The defendants called the following correctional officers: Eloy Medina, Thomas Atkins, Lucas Cuevas, B. Sanchez, Joshua Mensing, Alexander Meden, Edward Cary, Mark Parra, and Gregorio Salazar (with the last two by videotaped testimony).[15] Mr. Espinoza then testified.[16]

### 1. Salinas Valley State Prison Grievance Procedures

The parties do not contest, and the court held at summary judgment, that the defendants showed that a grievance process existed and was generally available at the prison.[17]

Salinas Valley State Prison's administrative-grievance process is set forth in 15 Cal. Code. Regs. § 3084 *et seq.*[18] That administrative-grievance process consists of three levels of review and must be initiated with a Form 602 within thirty days of the challenged event.[19] *See* 15 Cal. Code Regs. §§ 3084.2(a), 3084.8(b). Using this process, an inmate "may appeal any policy, decision, action, condition, or omission by the department or its staff that the inmate . . . can demonstrate as having a material adverse effect upon his or her health, safety, or welfare." *Id.* § 3084.1(a). The process consists of three levels of review, *id.* § 3084.7; and, generally, only a third-level decision fully exhausts an inmate's administrative remedies. *Id.* § 3084.1(b); *Woodford v. Ngo*, 548 U.S. 81, 85–86, 93–94 (2006).

---

[13] Trial Worksheet – ECF No. 119-1; Final Joint Exhibit List – ECF No. 121.

[14] ECF Nos. 108, 110, and 117.

[15] 7/13/17 Reporter's Transcript ("RT") 253–54.

[16] RT 253.

[17] Summary-Judgment Order – ECF No. 78 at 2–3 (citing Voong Decl. – ECF No. 53, ¶¶ 3–8, Ex. A).

[18] *Id.* (citing Voong Decl ¶¶ 3–8, Ex. A (attaching the 2014 regulations)).

[19] *Id.*

The court turns to Mr. Espinoza's efforts to exhaust his administrative remedies, first in the infirmary and then in the D-9 unit.

## 2. Mr. Espinoza Is Shot, Taken to the Hospital, and Placed in the Prison Infirmary

On March 7, 2014, Mr. Espinoza was in a fight with two fellow inmates on the prison yard.[20] In response to the fight, Correctional Officer Aboytes fired his mini-14 rifle twice and hit Mr. Espinoza in the hand and neck.[21] His hand was "destroyed," his "wrist was shattered[,] and [his] fingers were broken."[22]

Mr. Espinoza was taken to an outside hospital for medical treatment, where he stayed for three weeks.[23] He had multiple surgeries to repair his injuries,[24] including a bone graft.[25] Pins were inserted into three of his fingers and his wrist, and his arm was put in a hard cast.[26] Mr. Espinoza suffered "screaming pain" while at the hospital and was "real medicated."[27] He did not think to ask for a Form 602 because he was in too much pain.[28] (As described below, because he did not have access to the forms in the outside hospital, prison officials did not count the three weeks there in calculating the 30-day period to file a grievance form.)

On March 28, 2014, Mr. Espinoza returned to the prison, and prison officials housed him in the Correctional Treatment Center (the prison infirmary) because he "required a higher level of medical care than could be provided in a regular housing unit."[29] When Mr. Espinoza arrived in

---

[20] FAC ¶¶ 1–2; Answer to FAC – ECF No. 43, ¶¶ 1–2.

[21] FAC ¶ 6; Answer to FAC ¶ 6.

[22] Espinoza Dep. – ECF No. 63-6 at 23 (p. 22). Where this order cites depositions, the first pinpoint citation is to the ECF-generated page number; the additional, parenthetical "p." citation is to the deposition transcript's original pagination.

[23] FAC ¶ 39; Answer to FAC ¶ 39; Meyer Decl., Ex. 9 – ECF No. 63-9 at 3.

[24] FAC ¶ 9; Answer to FAC ¶ 9; Espinoza Test. – RT 165–66.

[25] Espinoza Test. – RT 165:21–166:10.

[26] Espinoza Dep. – ECF No. 63-6 at 29, 69 (pp. 28, 68); Parra Decl. – ECF No. 50, ¶ 11 (noting that Mr. Espinoza had a pin in his hand); FAC ¶ 9.

[27] Espinoza Dep. – ECF No. 63-6 at 45 (p. 44).

[28] Espinoza Test. – RT 166:11–18.

[29] O'Brien Decl., Ex. A – ECF No. 49 at 14; Parra Decl. – ECF No. 40, ¶ 10.

the infirmary, he had pins in his hand, 50 staples in his arm, and staples in his leg.[30] Mr. Espinoza testified that he was in significant pain along his entire right side, slept a lot, and received medication roughly every four hours during his first ten days in the infirmary; he could not even get out of bed to use the restroom.[31] He was taking a lot of medications, and he still takes Neurontin/Gabapin.[32]

The infirmary "is like a hospital within the prison" where inmates with medical conditions are treated.[33] The front of the infirmary has an emergency room, a clinic, and doctors' offices.[34] The back consists of housing cells for inmates receiving inpatient medical care.[35] There are twenty-four cells in the infirmary: twelve for mental-health patients and twelve for medical patients.[36] Each cell houses one inmate; no patient has a cellmate.[37] During his stay from March 28, 2014 until June 22, 2014, the prison housed Mr. Espinoza in cell 24, which had its own shower and restroom.[38] The cells have an intercom, which, "[w]hen pressed, . . . lights up an indicator at the [infirmary] officers' station."[39] The cells use a two-door, anteroom, access system.[40]

### 3. Mr. Espinoza Is Placed on Administrative Segregation Status

On April 3, 2017, in the infirmary, prison officials placed Mr. Espinoza on "administrative segregation status" ("Ad-Seg Status").[41] Generally, inmates involved in a fight will be housed "in

---

[30] Espinoza Test. – RT 170:2–16.

[31] Espinoza Test. – RT 171:2–172:3.

[32] Espinoza Test. – RT 167:2–3.

[33] Atkins Decl. – ECF No. 46, ¶ 9.

[34] Atkins Test. – RT 29:2–10, 42:2–14; Chavez Test. – RT 74:11–17; Cary Test. – RT 151:19–152:5.
[35] *Id.*

[36] Atkins Decl. – ECF No. 46, ¶ 8.

[37] *Id.*

[38] Atkins Test. – RT 29:14–25; Chavez Test. – RT 67:16–24; Espinoza Test. – RT 167:17–19; Exs. 2 (inmate location log), 130 (infirmary photo), 132 (infirmary cell photo).

[39] Atkins Decl. – ECF No. 46, ¶ 7.

[40] Atkins Decl. – ECF No. 46, ¶ 9; Parra Dep. – ECF No. 63-12 at 8–9 (pp. 36–37).

[41] Atkins Decl. – ECF No. 46, ¶ 14; Parra Decl. – ECF No. 50, ¶¶ 13–14; Meden Test. – RT 138:22–140:2, 141:21–23; Ex. 120.

[the] administrative segregation[] [unit] to ensure no more violence occurs."[42] But inmates in the infirmary, who would otherwise "be housed in administrative segregation" if not for their healthcare needs, are placed on Ad-Seg Status.[43] And so Mr. Espinoza, who "was being charged with a rules violation report for his involvement in the attack on the yard that led to his being shot," was placed on Ad-Seg Status in the infirmary.[44]

Mr. Espinoza's Ad-Seg Status limited his movement in the prison. Inmates so classified are not allowed out of their cells, for example, to go to the yard.[45] They can leave their cells only to see the infirmary doctor; in that case, the inmate will be handcuffed, taken to the doctor, and then back to his cell.[46]

Mr. Espinoza's Ad-Seg Status also affected his daily contacts with prison staff. Officers in the infirmary work three watches: first watch (10:00 p.m. to 6:00 a.m.), second watch (6:00 a.m. to 2:00 p.m.), and third watch (2:00 pm to 10:00 p.m.).[47] Officers escort medical staff into these inmates' cells at least three times per day for food and twice for medication.[48] The evidence supports the conclusion that the rule was that two officers acted as escorts for medical staff providing food and medicine to Ad-Seg prisoners.[49] But officers and Mr. Espinoza also testified that sometimes only one officer was an escort.[50] Possibly this is because — as officers testified — the infirmary was a calmer and more relaxed environment than the general population, and inmates (including Mr. Espinoza) left their "politics" at the door.[51] Officer Atkins, for example,

---

[42] Parra Decl. – ECF No. 50, ¶ 13.

[43] Atkins Decl. – ECF No. 46, ¶ 10.

[44] *Id.*, ¶ 14; Parra Decl. – ECF No. 50, ¶¶ 13–14.

[45] Atkins Dep. – ECF No. 63-8 at 15–17 (pp. 44–46).

[46] *Id.* at 17–19 (pp. 46–48).

[47] Atkins Test. – RT 40:13–41:5; Cuevas Test. – RT 48:18; Sanchez Test. – RT 94:21–22, 96:7–8.

[48] Atkins Decl. – ECF No. 46, ¶¶ 23–24.

[49] Atkins Test. – RT 38:15; Cary Test. – RT 154:11–155:16; Espinoza Test. – RT 191:12–18.

[50] Atkins Decl. – ECF No. 46, ¶ 10; Atkins Test. – RT 38:12–39:4; Chavez Test. – RT 79:5–10; Espinoza Decl. – ECF No. 62, ¶ 5.

[51] Atkins Test. – RT 38:15–18, 41:8–19; Cuevas Test. – RT 53:24–54:6; Chavez Test. – RT 76:15–25, 79:11–12.

"regularly asked [Mr.] Espinoza how he was doing and if he needed anything," and "told him if he needed anything, to let [him] or the other officers know."[52] The court finds that Ad-Seg prisoners have regular access to officers in the infirmary and that Mr. Espinoza specifically encountered correctional officers at least five times on any given day.

### 4. Mr. Espinoza's Access to Grievance Forms While in the Infirmary

The parties do not contest, and the court held at summary judgment, that the Form 602 grievance forms are generally available in the infirmary — including for Ad-Seg inmates. Inmates can request grievance forms (1) from officers and medical staff during cell visits, (2) by flagging down an officer during rounds, (3) by using the intercom system, or (4) through the law library.[53] At the hearing, officers testified uniformly that Form 602s were always at the officers' station in the infirmary,[54] more were available at the neighboring mental-health unit,[55] and more could be printed if they ran low.[56] The court finds that Form 602s were available at the officers' station in the infirmary.

Officers testified that they gave out many grievance forms to inmates housed in the infirmary.[57] They testified that inmates could ask them for forms, including in person during the officers' rounds.[58] The court finds that inmates in the infirmary generally could ask officers in person for grievance forms, and if they asked, the officers generally would provide them.

Inmates could access the law library by sending a Form 22 (which is a form that inmates use for general requests).[59] The court finds that a Form 22 was a means of asking for a Form 602 but

---

[52] Atkins Decl. – ECF No. 46, ¶ 16; Meden Test. – RT 142:6–17.

[53] *Id.* ¶¶ 25–28.

[54] Atkins Test. – RT 39:18–40:8; Chavez Test. – RT 72:21–25; Cary Test. – 149:9–18.

[55] Chavez Test. – RT 73:2–4.

[56] Atkins Test. – RT 40:9–12; Chavez Test. – RT 73:4–5.

[57] Atkins Test. – RT 39:25–40:1; Cuevas Test. – RT 57:7–11; Chavez Test. – RT 73:6–74:3; Cary Test. – RT 151:13–14.

[58] Atkins Test. – RT 34:18–23; Cuevas Test. – RT 55:13–18; Chavez Test. – RT 71:23–72:9; Meden Test. – RT 140:20–141:15; Cary Test. – RT 149:21–150:3.

[59] Atkins Test. – RT 38:21–25, 39:14–18; Ex. 107 (Form 22).

was not an ordinary or obvious means. Officers testified that theoretically, an inmate could use a Form 22, but inmates do not typically use Form 22s to ask for Form 602s because it is easier to ask for a Form 602.[60] Officers said they had never heard of an inmate's using a Form 22 to request a Form 602.[61] The court concludes that the ordinary means for an Ad-Seg inmate to obtain a Form 602 in the infirmary was to ask an officer, who would get it from the officers' station. (By contrast, as discussed below, inmates in general Ad-Seg housing have access to a weekly supply cart with Form 602s.[62])

Officers testified that nurses had access to the forms at the officers' station and could give them out if they wanted to.[63] There was no testimony about whether nurses gave out forms. Indeed, the officers testified that they acted as security to the medical staff performing their medical treatment.[64] Based on the record, the court concludes that while it is possible for medical staff to provide Form 602s from the officers' station, as a practical matter, nothing supports the conclusion that they gave out Form 602s. Instead, correctional officers gave out forms.

The court also finds that the intercoms in the infirmary cells were not an ordinary means of getting a Form 602. Officers testified that the intercoms could be used for non-emergency events (such as asking for a form).[65] But there was no testimony that anyone ever used them for non-emergency requests (such as asking for a Form 602).[66] The photograph shows a red button next to a speaker with the words "push for help."[67] Mr. Espinoza used it once for a medical emergency, for example.[68]

---

[60] Chavez Test. – RT 72:15–20; Cary Test. – RT 158:3–8.

[61] Cuevas Test. – RT 64:21–23; Cary Test. – RT 157:24–158:8.

[62] Atkins Test. – RT 46:13–15; Cary Test. – RT 157:21–23.

[63] Atkins Test. – RT 39:18–24; Meden Test. – RT 142:16–17.

[64] Sanchez Test. – RT 92:1–19; Cary Test. – RT 149:19–150:9.

[65] Atkins Test. – RT 33:17–23; Cuevas Test. – RT 56.

[66] Cuevas Test. – RT 64:16–20.

[67] Ex. 139.

[68] Espinoza Test. – RT 192:19–193:14; Atkins Test. – RT 32:8–16 (could use intercom in the event of a fall or injury).

In sum, the infirmary officers testified consistently — and the court finds — that the ordinary way to obtain a Form 602 was to ask an officer directly so that the officer could bring one from the officers' station. The court concludes too that Mr. Espinoza could ask officers for a Form 602 and that officers generally brought forms to inmates who asked for them.

**5. Mr. Espinoza Submits Request Forms and Asks for a Grievance Form**

**5.1 Forms That Mr. Espinoza Submitted In the Infirmary**

The defendants identify forms that Mr. Espinoza submitted while he was in the infirmary.

First, Officer Parra identifies a request form (Form 22) that Mr. Espinoza submitted on May 27, 2014.[69] Mr. Espinoza asked for "forms for case law along with forms for supplies."[70] Mr. Espinoza testified that (through this form) he intended to ask the library for legal documents, including a general grievance form (Form 602).[71] Officer Parra signed it and directed it to the law library.[72] There is no evidence that the library responded.[73]

Second, Mr. Espinoza submitted a Form 22 on June 2, 2014.[74] In it, he asked whether a physical therapist was going to visit him, noting that he had "seen [the] therapist only twice [ ] when [he] was told [the therapist] would be [there] often."[75] Mr. Espinoza also noted that someone (presumably a correctional officer) "made your rounds today . . . but didn't stop by my room," and noted that he was still having a lot of pain in his hand.[76] Officer Atkins signed the form.[77]

The court finds that these forms support the officers' testimony that if an inmate asked for forms, they would bring them.

---

[69] Parra Decl. – ECF No. 50, ¶ 25, Ex. A.

[70] *Id.*

[71] Espinoza Dep. – ECF No. 63-6 at 34–35 (pp. 33–34).

[72] Parra Decl. – ECF No. 50, ¶ 25, Ex. A.

[73] *See* Parra Dep. – ECF No. 63-12 at 41 (p. 96).

[74] Atkins Decl. – ECF No. 46, ¶ 29, Ex. A.

[75] *Id.*

[76] *Id.*

[77] *Id.*

### 5.2 Mr. Espinoza Requests a Form 602

As described above, Mr. Espinoza arrived at the infirmary on March 28, 2014, and prison officials placed him on Ad-Seg Status on April 3, 2014. Mr. Espinoza testified that the meeting lasted for three or four minutes and happened when he was in bed.[78] The Correctional Classification Committee read him the "lock-up order" and "115" and gave him the incident report.[79]

Mr. Espinoza did not read the incident report during his first week in the infirmary because he did not have the energy.[80] But because there was no riot, danger to a correctional officer, or weapon, Mr. Espinoza wondered why the officer shot him.[81] He pushed through his pain and read the report.[82] At this point, he had been in the infirmary for about a week to ten days.[83] He disagreed with the report and decided to get a Form 602 to file a grievance.[84] He filed Form 602s before, knew he needed to get a form, and needed help writing it due to his wrist injury.[85] He also knew that he had to turn the form in before the 30-day deadline expired at the end of April.[86]

Mr. Espinoza testified that he asked for a Form 602 four times while he was in the infirmary: three times from Officer Parra and once from an unnamed officer.[87]

### 5.3 Mr. Espinoza's Interactions With Officer Parra

Mr. Espinoza slept during first watch (10:00 p.m. to 6:00 a.m.) and saw different officers during second watch.[88] Officer Parra generally worked third watch (2:00 p.m. to 10:00 p.m.) and

---

[78] Espinoza Test. – RT 172:23–173:2.

[79] *Id.*

[80] Espinoza Test. – RT 172:4–18, 173:3–6.

[81] Espinoza Test. – RT 173:7–19.

[82] *Id.*

[83] Espinoza Test. – RT 173:23–25.

[84] Espinoza Test. – RT 173:20–174:5.

[85] Espinoza Test. – RT 174:18–175:15.

[86] *Id.*

[87] Espinoza Dep. – ECF No. 63-6 at 29–32 (pp. 28–31).

[88] Espinoza Test. – RT 188:23–189:5.

took a dinner break at the officers' station (where the Form 602s were kept) during his shift.[89] Officer Parra described himself as a "workaholic" who loved his job and worked double shifts, lasting 16 hours, two to four times in a five-day work week.[90] Mr. Espinoza testified that because he saw Officer Parra regularly and saw the good rapport he had with the nursing staff, he decided to ask him for a Form 602.[91] He asked him for a Form 602 and for help filling it out three times, but he never received a Form 602.

First, after he read the incident report around his tenth day in the infirmary, Mr. Espinoza asked Officer Parra for a Form 602 and for help filling it out when Officer Parra came by with medical staff for a vitals check in the afternoon.[92] He explained to Officer Parra that he could not write and needed help to file the grievance.[93] But, according to Mr. Espinoza, Officer Parra responded that "somebody from up front would have to come and help [you]."[94] Mr. Espinoza did not know exactly what "up front" meant (and thought it might mean other buildings).[95] Mr. Espinoza did not receive a Form 602 and thought Officer Parra forgot.[96]

Second, a few days later, Mr. Espinoza again asked Officer Parra for a Form 602 and for help filling it out.[97] Again, Officer Parra responded that someone from "up front" would need to come help him.[98] This time, Mr. Espinoza thought Officer Parra did not want to help.[99]

Third, Mr. Espinoza waited another day, asked again for a form and help, received the same response, and figured that Officer Parra was not going to help him.[100]

---

[89] Parra Dep. – ECF No. 63-12 at 16 (p. 48).

[90] *Id.* at 16–17 (pp. 48–49).

[91] Espinoza Test. – RT 177:18–178:12.

[92] Espinoza Test. – RT 179; *see also* Espinoza Dep. – ECF No. 63-6 at 30 (p. 29).

[93] Espinoza Test. – RT 179–80.

[94] *Id.*

[95] *Id.*

[96] Espinoza Test. – RT 180–81.

[97] *Id.* (a "few" days or "two" days).

[98] *Id.*

[99] Espinoza Test. – RT 182–83.

[100] *Id.*

Officer Parra testified that if an inmate asked him for a Form 602, he would give the form, and he has given out Form 602s as an officer in the infirmary.[101] He helped other inmates fill out medical Form 602s: mental-health patients who could not use pens or pencils because of their status; an inmate who was blind; and an inmate who could not spell.[102] He would help an inmate fill out a form who needed it, but not always right away.[103] But officers would help inmates who needed help.[104]

Officer Parra remembered Mr. Espinoza — from bringing him meals and conducting medical escorts — but he would not recognize him on the streets.[105] He vaguely remembers that Mr. Espinoza asked him for a healthcare grievance Form 602 (or "medical 602"), and that he left it on his bed.[106] (Mr. Espinoza denies this.[107]) He authenticated the Form 22 that Mr. Espinoza submitted May 27, 2014.[108] Mr. Espinoza did not ask for help filling out the form (and never asked for assistance for the bathroom or shower or otherwise).[109]

Officers do not work in the back and front of the clinic on the same shift.[110]

**5.4 Mr. Espinoza Asks Another Officer For a Form 602 and Submits a Form 22**

After Officer Parra (on third watch) failed to bring him a Form 602, Mr. Espinoza asked another officer on second watch for a Form 602 and help filling it out; he did not know the officer's name and described him as 5'7" or 5'8", with short blond hair, white, and in his 40s.[111]

---

[101] Parra Dep. – ECF No. 63-12 at 4 (p. 32).

[102] *Id.* at 23–24, 26 (pp. 63–64, 66).

[103] *Id.* at 26 (p. 66).

[104] *Id.* at 23–25 (pp. 63–65).

[105] *Id.* at 31, 37 (pp. 71, 89 ).

[106] Parra Decl. – ECF No. 50, ¶ 23; Parra Dep. – ECF No. 63-12 at 4 (p. 32), 43–47 (pp. 98–102).

[107] Espinoza Decl. – ECF No. 62, ¶ 6; Espinoza Test. – RT 184:3–8.

[108] Parra Dep. at 40–41 (pp. 92, 96).

[109] *Id.* at 47–48 (pp. 102–03).

[110] Atkins Test. – RT 42; Cary Test. – RT 152.

[111] Espinoza Test. – RT 186.

The officer responded "we'll see" but never brought a form.[112] Mr. Espinoza knew that his time in the infirmary was coming to an end and submitted a Form 22 that he had in his property to get a Form 602.[113] Officer Parra signed the form.[114] (This is the Form 22 described above, signed on June 2, 2014, asking for "forms for case law" and "forms for supplies.") Mr. Espinoza used a Form 22 because he thought Officer Parra would not respond if he asked for a Form 602 and thought that his request for "supplies" included a Form 602 without drawing attention to his request.[115] By this time, Mr. Espinoza was writing again somewhat but with pain.[116]

Mr. Espinoza did not ask any other officer in the infirmary for a Form 602.[117] Officers who worked in the clinic also testified that he did not ask them for a Form 602 and otherwise did not ask for help with showering, bathing, and the like.[118]

It is undisputed that Mr. Espinoza never received a Form 602 when he was in the infirmary.[119]

## 6. Mr. Espinoza Leaves the Infirmary, Is Placed in the Administrative-Segregation Unit, and Submits a Grievance

After nearly three months in the infirmary, on Sunday, June 22, 2014, Mr. Espinoza moved to the general administrative-segregation unit, called D-9 (and also Delta 9 or Z-9).[120] Inmates receive a Form 602 (and other supplies) in their bedroll when they arrive.[121] There is a weekly supply cart on Sundays with the forms.[122] Weekly audit forms show that Mr. Espinoza received

---

[112] *Id.*

[113] Espinoza Test. – RT 194–95; Ex. 106.

[114] *Id.*

[115] Espinoza Test. – RT 197.

[116] Espinoza Test. – RT 196.

[117] Espinoza Test. – RT 186:20–21.

[118] Atkins Test. – RT 34; Cuevas Test. – RT 52–55; Chavez Test. – RT 71; Cary Test. – RT 149–51.

[119] Summary-Judgment Order – ECF No. 78 at 8.

[120] Espinoza Dep. – ECF No. 63-6 at 37–38 (pp. 36–37).

[121] Sanchez Test. – RT 93–94.

[122] Sanchez Test. – RT 94–95.

his supplies for the weeks ending June 29, 2014 and July 6, 2014.[123] An officer walks around daily with a library cart with Form 602s, among other forms.[124]

The prison was on lockdown on June 27 and 28, 2014 and then moved to a modified program from June 29 to July 22, 2014.[125] The only thing that changed during lockdown was yard access.[126] Officer Sanchez did security checks three times an hour; this was an opportunity to obtain Form 602s.[127]

Mr. Espinoza testified that he made it to his cell at the end of second watch, did not receive a Form 602 in the initial bedroll, missed the weekly supply cart, never heard of the daily library cart, could get a Form 602 only from the weekly supply cart, could not get them from guards (especially during the lock-down) because they were too busy, and obtained the form the second Sunday, after the three-day lockdown.[128] (Mr. Espinoza's counsel said on the second day of the hearing that they first heard of the library cart from Officer Sanchez's testimony at the hearing.[129])

After he obtained the Form 602, Mr. Espinoza asked Lieutenant Salazar for assistance writing it, and Lieutenant Salazar sent Officer White to help.[130] Mr. Espinoza ultimately declined Officer White's help.[131] He had a soft cast, and his injuries made it "very difficult for [him] to write," but he completed the form on his own.[132] It took him "hours": he started in the morning, took breaks for lunch, dinner, and when his hand hurt, and "finished it right after dinner[;] like 7:00 o'clock maybe."[133] In it, Mr. Espinoza challenged the March 7 shooting as unnecessary, excessive force.[134]

---

[123] Sanchez Test. – RT 102–04; Ex. 124.

[124] Sanchez Test. – RT 92–93, 108–09; Mensing Test. – RT 35.

[125] Sanchez Test. – RT 97–99; Ex. 128.

[126] Sanchez Test. – RT 99:12–100:7.

[127] Sanchez Test. – RT 82–84.

[128] Espinoza Test. – RT 198–209.

[129] Closing Statement by Attorney Chen – RT 287–88.

[130] Salazar Decl. – ECF No. 51, ¶¶ 3–5; Salazar Dep. – ECF No. 63-16 at 21–23 (pp. 38–40).

[131] Espinoza Test. – RT 210–11.

[132] Espinoza Dep. – ECF No. 63-6 at 51–53, 68–69 (pp. 50–52, 67–68).

[133] Id. at 53, 67–68 (pp. 52, 66–67).

[134] Medina Decl. – ECF No. 48, Ex. B (Mr. Espinoza's Form 602).

Mr. Espinoza submitted the Form 602 grievance on July 6 — fourteen days after he left the infirmary — and the appeals coordinator received it the next day.[135] Mr. Espinoza sent the Form 602 with a Form 22 "to provide myself proof that my 602 appeal was sent on the date below."[136] He testified that he included a cover letter explaining that he was shot in the hand and could not get help at the infirmary getting the Form 602 or writing it.[137] The idea for sending the Form 22 came from another inmate in D-9 named Cody.[138]

### 7. The Appeals Coordinator Cancels Mr. Espinoza's Grievance as Untimely

Appeals Coordinator Medina processed Mr. Espinoza's grievance.[139] When he received it, he "first noted that it concerned an allegation of unnecessary excessive force occurring on March 7, 2014, four months before the grievance had been submitted."[140] The grievance was therefore untimely, but Coordinator Medina reviewed Mr. Espinoza's case for "exceptional circumstances" justifying the delay.[141] He did not penalize Mr. Espinoza for the three weeks spent at an outside hospital, but concluded "there was nothing in his records or in his grievance that justified his failure to submit his appeal within thirty days of his return to [the prison]."[142] He accordingly cancelled the grievance as untimely and informed Mr. Espinoza of this conclusion in writing.[143] He also returned the "enclosed documents" as part of the cancellation; Mr. Espinoza testified that his cover letter was not enclosed.[144]

The written notice informed Mr. Espinoza that he could not resubmit his cancelled appeal, but

---

[135] Medina Decl. – ECF No. 48, Exs. B & C.

[136] Ex. 103 (Mr. Espinoza's Form 22).

[137] Espinoza Test. – RT 214–15.

[138] Espinoza Test. – RT 217.

[139] Medina Decl. – ECF No. 48, ¶ 6.

[140] *Id.*

[141] *Id.* ¶¶ 6–7.

[142] *Id.* ¶ 7.

[143] *Id.* ¶¶ 7, 9.

[144] Ex. 104 (cancellation notice); Espinoza Test. – RT 220.

that he could appeal the cancellation itself.[145] Mr. Espinoza did[146] and argued that he could not timely file a grievance because, without success, he "repeatedly asked staff for assistance" to write his grievance and did not have access to the law library while in the infirmary; he also explained that he had enclosed a cover letter with his initial Form 602 explaining the reason for delay but the cover letter was not returned.[147] In full, Mr. Espinoza stated:

> On 7-21-2014 I received a "Cancellation Notice for Appeal Log # S.V.S.P-14-02865 Exceeding Time Limits[.]" A cover letter explaining the circumstances for the delay was enclosed and did not return. I was shot in my hand and was not able to write an appeal in a timely fashion. I repeatedly asked staff for assistance and accommodate my new disability which went unattended. I was housed at C.T.C.[;] no law library is available and no law clerks are available to assist me in writing an appeal. I am being denied access to the courts, being discriminated against for being disabled, and not being accommodated for said disability.[148]

At the second-level review, Mr. Espinoza did not name anyone to interview; the prison upheld the cancellation at the second-level review because Mr. Espinoza "provided no documentation that [he] was totally incapacitated and/or unable to write an appeal within the prescribed time limits," his claim concerning law-library access was moot, and the staff refuted his claims that they refused to assist him.[149] (There was testimony at trial that prisoners knew guards' names because they wear name tags.[150]) Mr. Espinoza testified that he obtained Officer Parra's name later, when he was back in D-9.[151]

The prison upheld the cancellation at the third level of review.[152]

---

[145] Medina Decl. – ECF No. 48, ¶ 9, Ex. D.

[146] *Id.* ¶ 10; Meyer Decl., Ex. 19 – ECF No. 63-19 (Form 602 contesting cancellation); *see also* Ex. 105 at Bates Nos. ESP002739–40 (same).

[147] *Id.*

[148] *Id.*

[149] *Id.*

[150] Atkins Test. – RT 42:23–43:4; Cuevas Test. – RT 57:20–58:9; Cary Test. – RT 153.

[151] Espinoza Test. – RT 224:14–225:6.

[152] Ex. 1; *see also* Meyer Decl., Ex. 30 – ECF No. 63-30 (same).

## 8. Other Findings

Based on the medical evidence, Mr. Espinoza's testimony, and his request for help from Lieutenant Salazar, the court finds that Mr. Espinoza's injury impeded his ability to write a Form 602 on his own through at least May 2014 and probably up to the time he transferred from the infirmary to general Ad-Seg housing.[153] His short letters home to do not change this conclusion.[154]

## GOVERNING LAW

"The Prison Litigation Reform Act [PLRA] requires that a prisoner exhaust available administrative remedies before bringing a federal action concerning prison conditions." *Griffin v. Arpaio*, 557 F.3d 1117, 1119 (9th Cir. 2009) (citing 42 U.S.C. § 1997e(a)). The PLRA more fully provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *Reyes v. Smith*, 810 F.3d 654, 657 (9th Cir. 2016). It requires an inmate to pursue every available step of the prison grievance process. *See Woodford*, 548 U.S. at 90; *Harvey v. Jordan*, 605 F.3d 681, 683 (9th Cir. 2010) ("a [California state] prisoner exhausts the grievance process when he completes the third level" of review). The prisoner must fully exhaust administrative remedies before filing suit. *See, e.g.*, *McKinney v. Carey*, 311 F.3d 1198, 1199 (9th Cir. 2002).

But "[a]n inmate is required to exhaust only *available* remedies." *Albino*, 747 F.3d at 1171 (citing *Booth v. Churner*, 532 U.S. 731, 736 (2001)). In other words, an inmate "must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). "To be available, a remedy must be available 'as a practical matter'; it must be 'capable of use; at hand.'" *Albino*, 747 F.3d at 1171 (quoting *Brown v. Valoff*, 422 F.3d 926, 937 (9th Cir. 2005)). In *Ross v. Blake*, the Court "note[d] as relevant here three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief."

---

[153] Espinoza Test. – RT 196.

[154] *Id.*

136 S. Ct. at 1859. An administrative remedy is unavailable if: (1) "it operates as a simple dead

end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates";

(2) the "administrative scheme [is] so opaque that it becomes, practically speaking, incapable of

use"; or (3) "when prison administrators thwart inmates from taking advantage of a grievance

process through machination, misrepresentation, or intimidation." *Id.* The Court gave these

examples but stressed that "courts in this and other cases must apply [the legal standard] to the

real-world working of prison grievance systems." *Id.*

If the prisoner has failed to exhaust, it is proper to dismiss without prejudice those parts of the

complaint that are barred by § 1997e(a). *Jones v. Bock*, 549 U.S. 199, 223–24 (2007); *Lira v.*

*Herrera*, 427 F.3d 1164, 1175–76 (9th Cir. 2005). Indeed, exhaustion is mandatory — it is no

longer left to the district court's discretion, *see Woodford*, 548 U.S. at 85 (citing *Booth*, 532 U.S.

at 739) — and it "should be decided, if feasible, before reaching the merits of a prisoner's claim."

*Albino*, 747 F.3d at 1170. So, the case may proceed to the merits only "[i]f the district judge holds

[(1)] that the prisoner has exhausted available administrative remedies, [(2)] that administrative

remedies are not available, or [(3)] that a prisoner's failure to exhaust available remedies should be

excused." *Id.* at 1171 ("We reiterate that, if feasible, disputed factual questions relevant to

exhaustion should be decided at the very beginning of the litigation.").

The proper device for raising failure to exhaust is normally by motion for summary judgment

under Rule 56. *Id.* at 1166 (noting that, in the rare case "that a failure to exhaust is clear on the

face of the complaint," a Rule 12(b)(6) motion is appropriate). And where, as here,[155] an

exhaustion-based summary-judgment motion is denied, "disputed factual questions relevant to

exhaustion should be decided by the judge, in the same manner a judge rather than a jury decides

factual questions relevant to jurisdiction and venue." *Id.* at 1170–71 (citing *McNutt v. Gen. Motors*

*Acceptance Corp.*, 298 U.S. 178, 188–90 (1936) (subject-matter jurisdiction); *Murphy v.*

*Schneider Nat'l, Inc.*, 362 F.3d 133, 139–40 (9th Cir. 2004) (venue); *Lake v. Lake*, 817 F.2d 1416,

1420 (9th Cir. 1987) (personal jurisdiction)). "[T]he district judge may decide disputed question of

---

[155] *See* Summary-Judgment Order – ECF No. 78.

fact in a preliminary proceeding." *Id.* at 1168; *see also Jones v. Cal. Dep't of Corr.*, 584 F. App'x 496, 497 (9th Cir. 2014) (holding that it was an abuse of discretion where a district court did not hold an evidentiary hearing where "'factual questions [were] not readily ascertainable from the declarations of witnesses or questions of credibility predominate[d]'"). In doing so, the court may "inquire into the facts as they really exist," *see McNutt*, 298 U.S. at 184; and may "resolve any questions of credibility or fact," *see Lake*, 817 F.2d at 1420.

Failure to exhaust PLRA administrative remedies "is an affirmative defense the defendant must plead and prove." *Jones*, 549 U.S. at 204, 216. Prisoner complaints are not required to plead exhaustion. *Id.* at 215–17. The Ninth Circuit applies a burden-shifting framework, under which "a defendant must first prove that there was an available administrative remedy and that the prisoner did not exhaust that available remedy." *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (citing *Albino*, 747 F.3d at 1172). The burden then shifts to the plaintiff, "who must show that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him" because they were "ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile." *Id.* (internal quotation marks omitted). "The ultimate burden of proof, however, remains with the defendants." *Id.*; *see also Jones*, 549 U.S. at 216. If the undisputed evidence, viewed in the light most favorable to the prisoner, shows a failure to exhaust, then the defendant is entitled to summary judgment. *Albino*, 747 F.3d at 1166.

## ANALYSIS

Because Mr. Espinoza testified that he knew that he had 30 days after he returned from the outside hospital to file a Form 602, the main issue is whether the prison's grievance procedures were available to Mr. Espinoza during his first 30 days in the infirmary.

There is no evidence that the prison's grievance process is so confusing that "no ordinary prisoner can discern or navigate it." *Ross*, 136 S. Ct. at 1859. And there is no evidence that prison administrators thwarted Mr. Espinoza through machination, misrepresentation, or intimidation, or threatened to retaliate against him. *See, e.g.*, *McBride v. Lopez*, 807 F.3d 982, 987 (9th Cir. 2015) (discussing standard for unavailability based on threats); *Draper v. Rosario*, 836 F.3d 1072, 1080

(9th Cir. 2016). The inquiry thus is whether the administrative procedure was unavailable because officers were unwilling to provide relief to Mr. Espinoza. The court concludes that the procedure was not unavailable and holds that Mr. Espinoza failed to exhaust his administrative remedies.

Mr. Espinoza could not reasonably conclude — based only on his three attempts to obtain a Form 602 from Officer Parra and one attempt with an unnamed officer — that no administrative remedies were available to him. *See Draper*, 836 F.3d at 1079–80. Officers did not tell him, for example, that they would not deliver his grievance to the grievance office. *Cf. Camp v. Brennan*, 219 F.3d 279, 280 (3d Cir. 2000). Indeed, he could have asked any officer for a Form 602. He had the ability to ask for a Form 602 from the many officers he encountered on a daily basis. The forms were always at the officers' station (their lunch room in the infirmary). Officers regularly gave out forms to inmates who asked for them. And while Mr. Espinoza needed help filling out the Form 602 for some substantial period of time until at least May and probably until his transfer to general housing, the court credits the officers' testimony that they would help inmates fill out Form 602s if they needed help. Lieutenant Salazar's efforts to help Mr. Espinoza confirm this. Mr. Espinoza knew the rules: he previously submitted Form 602s, he knew about the 30-day requirement, and he knew he had to submit his Form 602 by the end of April. *Cf. Benson v. Peters*, No. 14-CV-00132-CL, 2016 WL 259701, at *4 (D. Or. Jan. 20, 2016) (remedy unavailable to confused inmate when prison misinterpreted request for clarification as notice of tort claim and terminated his ability to pursue internal appeal).

In sum, if an inmate had the ability and opportunity "to file a grievance timely, but failed to do so, he has not properly exhausted administrative remedies." *Marella v. Terhune*, 568 F.3d 1024, 1028 (9th Cir. 2009). And here, existing and generally available administrative remedies were not effectively unavailable to Mr. Espinoza. *See Draper*, 836 F.3d at 1079–80.

In reaching this conclusion, the court credits both Mr. Espinoza and Officer Parra. Both testified convincingly. *See, e.g.*, *Sansone v. Thomas*, No. 13-CV-01842-DAD, 2016 WL 7159285, at *6 (E.D. Cal. Dec. 7, 2016). Indeed, given the vagaries of recollection, the court can reconcile their testimony. Officer Parra vaguely remembers a Form 602 (albeit a medical 602). Mr. Espinoza asked for a Form 602, and he did not receive it. Perhaps there was a misunderstanding or a

mistake. But while the court can credit Mr. Espinoza's testimony — that he perceived that Officer Parra was not willing to help him — it cannot conclude that his efforts were sufficient.

The decision in *Andres v. Marshall* does not change this conclusion. *See* No. 15-56057, 2017 WL 3432609 (9th Cir. Aug. 8, 2017) (*per curiam*). In *Andres*, an excessive-force case, the prisoner submitted a Form 602 two days after the alleged incident but never received a response. *Id.* at *1. The Ninth Circuit concluded the prisoner "exhausted his available administrative remedies" because the prison rendered the grievance process effectively unavailable when it "improperly failed to process Andres' timely filed grievance." *Id*. at *2. Here, by contrast, Mr. Espinoza never submitted a Form 602; he asked for one three times from Officer Parra and one time from an unidentified guard.

And unlike *Sapp*, a medical-conditions case where the prisoner filed multiple grievances that the prison screened out repeatedly (and improperly) for incompleteness, Mr. Espinoza asked for forms only four times from two officers and then concluded that it was futile to ask again. 621 F.3d at 819 (prisoner took reasonable and appropriate steps by filing six grievance forms; also took additional steps to obtain his records and grieve the denials). Mr. Espinoza's several inquiries are not the "reasonable and appropriate steps" that the prisoner took in *Sapp*. They are not equivalent to the several grievances that the prisoner made in *Nunez v. Duncan*. *See* 591 F.3d 1217, 1220–21 (9th Cir. 2010) (the prisoner filed a grievance and appeal regarding a strip search and asked for the applicable regulation; the prison construed the appeal as request only for the regulation; the prisoner filed subsequent grievances, a FOIA request, and letters appealing the FOIA denial). And Mr. Espinoza's subjective conclusion of futility is not reasonable either, given that he asked an identified person only three times and an unidentified officer only once. Because he did not take "reasonable and appropriate steps to exhaust his . . . claim," he was "precluded from exhausting," not "by the Warden's mistake," but "through his own fault." *Id.* at 1224.

If Mr. Espinoza asked for a Form 602, and the prison officials refused him overtly, the court might conclude that he had exhausted his administrative remedies. *See Sapp v. Kimbrell*, 623 F.3d 813, 822 (9th Cir. 2010) (citing *Dale v. Lapin*, 376 F.3d 652, 656 (7th Cir. 2004); *Miller v. Norris*, 247 F.3d 736, 738, 740 (8th Cir. 2001). In *Miller*, for example, the prisoner alleged that he made a

United States District Court
Northern District of California

written request for a grievance form, the prison did not respond, and his mother attempted unsuccessfully to obtain the forms for him. 247 F.3d at 738. The Eighth Circuit remanded for consideration of whether the facts established exhaustion. *Id.* at 740. And the court might find exhaustion if Mr. Espinoza's efforts were more robust. In *Dale v. Lapin*, the prisoner "identifie[d] the prison employees from whom he requested forms: his counselor, his case manager, the on-duty floor officer, and members of his unit team." 376 F.3d at 655–56. He also identified the specific forms he requested, the on-duty floor officer's provision of only blank sheets of paper, his counselor's and case manager's explanation that they did not have the forms and he must ask the unit team, and his several unanswered notifications to the unit team about the denial of forms. *Id.* at 656. Mr. Espinoza's efforts do not approximate these, even by half.

This conclusion does not mean that Mr. Espinoza needed to ask every officer he encountered for a Form 602. The court's conclusion is only that that his modest efforts here were not the reasonable and appropriate steps to exhaust his claim, especially given Mr. Espinoza's knowledge about the 30-day rule. *Nunez*, 591 F.3d at 1224. In sum, the undisputed evidence, viewed in the light most favorable to Mr. Espinoza, shows that he failed to exhaust his administrative remedies. The defendants thus are entitled to summary judgment. *Albino*, 747 F.3d at 1166.

If the court had reached the opposite conclusion — that the four requests were sufficient and established futility —then the court would conclude that the appeal is otherwise timely because Mr. Espinoza submitted the Form 602 within 30 days after his transfer to general Ad-Seg housing.

## CONCLUSION

The court grants the defendants summary judgment on the ground that Mr. Espinoza did not exhaust his available administrative remedies.

**IT IS SO ORDERED.**

Dated: August 25, 2017

LAUREL BEELER
United States Magistrate Judge